# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FT. MYERS DIVISION

ROXANNE SPITLER,

Plaintiff,

-vs-                                          Case No.  2:10-cv-258-FtM-29DNF

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

Claimant, Roxanne Spitler seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for Disability Insurance Benefits, Widow's Insurance Benefits and Supplemental Security Income.  The Commissioner filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties filed legal memoranda in support of their positions.  For the reasons set out herein, it is respectfully recommended that the decision of the Commissioner be Affirmed in part, and Reversed and Remanded in part, pursuant to §205(g) of the Social Security Act, 42 U.S.C §405(g).

## I.      Social Security Act Eligibility, Procedural History, and Standard of Review

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § § 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable

-1-

to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d) (2); 20 C.F.R. § § 404.1505-404.1511.

### A.      Procedural History

On August 17, 2006 Claimant filed an Application for Disability Insurance Benefits and Supplemental Security Income for the period beginning August 5, 2006. (Tr. 14).  Her claim was initially denied on December 28, 2006. ( Tr. 14, 35-37), and denied upon reconsideration on June 21, 2007. (Tr. 14, 39-40).  On April 7, 2009, a hearing was held before Administrative Law Judge ("ALJ") Ruben Rivera, Jr. (Tr. 255).  The ALJ's decision, dated June 2, 2009, denied Claimant's claim for benefits. (Tr. 11-20). On March 2, 2010, the Appeals Council denied the Claimant's Request for Review after receiving additional medical reports. (Tr. 3-5).

### B.      Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405 (g).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate support to a conclusion.  Even if the evidence preponderated against the Commissioner's findings, we must affirm if the decision reached is supported by substantial evidence." *Crawford v. Comm'r.*, 363 F.3d 1155, 1158 (11th Cir. 2004)(citing *Lewis v. Callahan*, 125 F.3d 1436, 1439(11th Cir. 1997); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990)). In conducting this review, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ, but must consider the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Sullivan*, 894 F.2d 1329, 1330 (11th Cir. 2002); *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). However, the district court will reverse the Commissioner's decision on plenary review if the decision applied incorrect law, or if the decision fails to provide sufficient reasoning to determine that the

-2-

Commissioner properly applied the law. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994). The Court reviews de novo the conclusions of law made by the Commissioner of Social Security in a disability benefits case. Social Security Act, § 205(g), 42 U.S.C.A. § 405(g).

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920. The first step is considering work activity. If the claimant is doing any substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(a)(4)(i). The second step considers the medical severity of the impairment: if there is not a severe medically determinable physical or mental impairment, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). The third step also considers the medical severity of the impairment. If the claimant has an impairment that meets or equals one of the listings and meets the duration requirement, the claimant will be found to be disabled. 20 C.F.R. § 404.1520(a)(4)(iii). The fourth step is assessing the residual functional capacity of the claimant, and the claimant's past relevant work. If the claimant can still do her past relevant work, she will not be found disabled. 20 C.F.R. § 404.1520(a)(4)(iv). The fifth step considers the residual functional capacity as well as the age, education, and work experience of the claimant to see if she can make an adjustment to other work. If the claimant can make an adjustment to other work, the claimant will not be found disabled. 20 C.F.R. § 404.1520(a)(4)(v). The Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287; *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). Only after the Commissioner meets this burden does the burden shift back to the claimant to show that she is not capable of performing the "other work" as set forth by the Commissioner. *Doughty*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

## II.     Review of Facts

### A.     Background Facts

Claimant was fifty-three (53) years old at the time of the ALJ's decision. (Tr. 257). She has a twelfth grade education. (Tr. 257, 259).  She had previously worked as a manager at a Circle K gas station, from October 1984 until March 1999, as a front desk hotel clerk, from June 1999 until January 2000, and as a Shell Gas Station cashier, from April 2004 until the date of her accident, April 5, 2006. (Tr. 76-83, 257-258). Claimant's alleged disability is due to muscle spasms, chronic cervical and lumbar pain, osteoarthritis in her right thumb, and pain in her arms, neck, legs and back. (Tr. 258). Because of these conditions, Claimant has not worked since April 5, 2006, when she was involved in a car accident in which she sustained injuries. (Tr. 258, 259).

### B.     The ALJ's Findings

At step one, the ALJ found Claimant met the insured status requirements of the Social Security Act through December 31, 2011, and had not engaged in substantial gainful activity since April 5, 2006. (Tr. 16-17).

At the second step, the ALJ found that Claimant has the severe impairments of : 1) Arthritis; 2) Bulging Disc in the Lumber and Cervical Spine; and (3) Degenerative Disc Disease. (Tr. 17).  The ALJ made this finding after a review of the medical evidence in the record, and determined the impairments limit Claimant's ability to perform basic work activities.

However, at the third step, the ALJ found that Claimant did not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17). The ALJ made this finding by applying the two step process in compliance with 20 C.F.R. § 404.1529, which requires the ALJ to consider all symptoms and the extent to which the

-4-

symptoms can reasonably be accepted as consistent with the objective medical and other evidence. The ALJ considers the symptoms using a two step process: first, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce Claimant's pain or other symptoms; and second, once the impairment is established, the ALJ must evaluate the intensity, persistence and limiting effects of Claimant's symptoms to determine the extent to which they limit Claimant's ability to do basic work activities. 20 C.F.R. § 404.1529 (d). In order to adequately evaluate the effects of Claimant's symptoms, the ALJ must make a finding on the credibility of the statements based on a consideration of the entire case record. 20 C.F.R. § 404.1529(d)(3). The ALJ then determines what, if any, type of work the claimant is able to perform using past work history as a vocational factor. *See* 20 C.R.F. § 404.1565.

The ALJ determined that while Claimant's fulfilled the first step of the framework, she failed to meet the second step of the framework because her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 19). The ALJ considered the Physical Residual Functional Capacity assessment as performed by a Disability Determinations Services ("DDS") examiner and concluded that Claimant's functional capacity was well above what Claimant had stated she was able to do. (Tr. 18). The ALJ noted that while an MRI showed disc bulges, there were no herniated discs nor neurocompression present in Claimant's spine. (Tr. 19). The ALJ recognized that in a 2006 examination, Claimant had minor paraspinal tenderness and an intact range of motion without any significant complaints or any spasms. (Tr. 19). The ALJ noted that an EMG/nerve conduction study showed the right upper extremity was normal, despite Claimant's complaints that her neck pain was concentrated in her right upper extremity. (Tr. 18-19). The ALJ considered that in September 2006, six (6) months after the onset date of

Claimant's disability, she was placed at maximum medical improvement. (Tr. 18-19). The ALJ also noted that Claimant's most recent examination displayed normal gait, no neurological deficits and a good range of motion. (Tr. 18-19). The ALJ recognized that Claimant's hand was doing better after a recent injection, as well. (Tr. 19).

The ALJ determined Claimant could adequately perform past relevant work as a hotel clerk in her present condition. "This work does not require the performance of work-related activities precluded by [] Claimant's residual functional capacity." (Tr. 19). The ALJ compared Claimant's residual functional capacity (Exhibit 7F) with the physical and mental demands of the work and concluded "the claimant is able to perform it as actually performed." (Tr. 20).

### C.    Claimant's Medical History

Claimant was injured in a car accident on April 5, 2006. (Tr. 130). In the weeks following the accident, Claimant complained of headaches, pain and stiffness of the neck, low back pain that radiated from the buttocks and thigh into the calf on the right and some bilateral hip pain. (Tr. 157). At the time, the doctors determined Claimant was not a surgical candidate, but recommended she avoid strenuous activities. (Tr. 155). On May 15, 2006, Claimant noted some numbness in her right arm again, along with continued pain and stiffness in the neck, upper shoulders and lower back area. (Tr. 152).

By the end of September 2006, Claimant was placed at maximum medical improvement from her April 2006 accident. (Tr. 138-139). The doctor noted Claimant had difficulty performing some routine daily activities, such as playing the guitar, playing volleyball and completing housework, but determined Claimant was stable. (Tr. 138). A Physical Residual Functional Capacity assessment was completed at the end of December 2006; the Disability Determinations Services examiner determined that Claimant could lift fifty (50) pounds occasionally and twenty-five (25) pounds frequently, and that Claimant could stand

and/or walk for six (6) hours of an eight (8) hour day and sit for six (6) hours of an eight (8) hour day . (Tr. 178).

At the end of May 2007, Claimant underwent a neurologic examination and another MRI. (Tr. 196). The MRI revealed scattered spondylitic disease and bulging discs in the neck and thoracic spine. (Tr. 196). The neurologist noted that Claimant had a good range of motion, that Claimant had normal neurological exam results and that nothing more neurological needed to be done. (Tr. 196).

Another Physical Residual Functional Capacity assessment was completed in June 2007, which revealed that Claimant could lift twenty (20) pounds occasionally and twelve pounds frequently and that Claimant could stand and/or walk for six (6) hours of an eight (8) hour day and sit for six (6) hours of an eight (8) hour day. (Tr. 200). The same examination revealed normal gait, no neurological deficiencies, and good range of motion. (Tr. 200).

In November 2007 and April 2008, Claimant saw a doctor complaining of pain in her wrist and hand. (Tr. 222, 220). The doctor ordered an MRI, but Vocational Rehabilitation denied the request. (Tr. 219). In February 2008, Claimant's primary care physician assessed her as suffering from cervical and lumber spondylosis, polyneuropathy and cramp of limb. (Tr. 89).   In a May 2008 follow-up, the doctor determined Claimant suffered from bilateral thumb osteoarthritis, with greater pain in the right thumb than the left, as well as chronic cervical and lumber back pain. (Tr. 210). Thermoplastic splinting and anti-inflammatory injections were recommended to Claimant. (Tr. 211).   In June 2008, it appeared that Claimant had responded well to the injection and the splint was working. (Tr. 209). The doctor noted the sprain from the accident had been resolved. (Tr. 207). The doctor noted Claimant may need surgery in the future should the arthritis pain become more severe. (Tr. 207).

In August 2008, Claimant saw  Nobel Harrison, Ph.D., a licensed psychologist who diagnosed her

with Pain Disorder Associated with Both Psychological and General Medical Factors, a Depressive Disorder NOS [Significant Anxiety Component], Vocational/Occupational Problems and a Global Assessment Functioning ("GAF") score of 40. (Tr. 232).

### D.    Medical Evidence Provided Prior to ALJ's Decision

#### 1. Treating Sources

Claimant was seen by  Maribel Gonzales, ARNP, of Family Health Centers ("FHC") on January 7, 2005, complaining of left shoulder pain accompanied by "tingling and pinpricking sensations." (Tr. 111). Claimant was then injured in a car accident on April 5, 2006 and transported to Lee Memorial Hospital, where she complained of neck and back pain. (Tr. 130). The admitting physician, Dr. Joseph F. Gulde, M.D., noted only minor paraspinal tenderness without any spasms was present. (Tr. 131). Claimant complained of minor upper thoracic discomfort and Dr. Gulde ordered X-rays of the AP, lateral thoracic and lumbar spines, which revealed that only scoliosis was present. (Tr. 131). However, Dr. Gulde noted in his final report that narrowing of disc and hypertonic spurring was present. (Tr. 135).  Dr. Gulde's Working Diagnosis included: (1) Cervical strain/sprain; (2) Thoracolumbar strain; and (3) Scoliosis. (Tr. 131). Claimant was released from Lee Memorial Hospital in stable condition. (Tr. 132).

Claimant began seeing Dr. David B. Sudderth, M.D. of Neuroscience and Spine Associates ("NASA") on April 12, 2006. At her initial appointment, Claimant complained of neck, midthoracic and low back pain, along with daily headaches and discomfort in the shoulder. (Tr. 157). Claimant also complained of bilateral hand numbness, pain radiating through the left shoulder into the triceps and hands, pain in the shoulder joint and difficulty abducting and externally rotating the extremity. (Tr. 157). Claimant informed Dr. Sudderth she had been experiencing anxiety since the accident occurred. (Tr. 158). Dr. Sudderth noted Claimant had some spasms in the mid/lower cervical paraspinal region and patchy

-8-

tenderness in the midthoracic paraspinal region, especially L5-S1 with some spasms on the right. (Tr. 159).

Dr. Sudderth's initial diagnosis of Claimant was that she was suffering from cervical, thoracic and lumbar

myofascial injury, cervical and lumbar radiculopathy, occipital  neuralgia and possible rotator cuff injury.

(Tr. 160). Dr. Sudderth ordered an MRI of the cervical and lumbar spine and prescribed Vicodin and 400

MG of Skelaxin. (Tr. 160).  Upon review of the MRI taken at Lee Memorial Hospital, Dr. Sudderth

determined Claimant's spine showed narrowing of the disc space and osteophyte formation at multiple

levels, especially C5-6. (Tr. 156). Additionally, the thoracic spine showed a dextroconvex kyphoscoliosis.

(Tr. 156).

At Dr. Sudderth's recommendation, Claimant began seeing a chiropractor at Means Family

Chiropractic Clinic three times a week on April 13, 2006. (Tr. 174). The chiropractor noted Claimant had

pain and tenderness as well as myospasms located in the suboccipital, lower cervical, left upper thoracic,

midthoracic and L3-S1 areas bilaterally. (Tr. 174). Upon review of the X-rays taken at Lee Memorial

Hospital the day of the car accident, Claimant's chiropractor noted there were arthritic and degenerative

changes between C5-6 and C7, and considerable loss of disc height between C6 and C7, as well as a

hypolordotic cervical curve to the point of kyphosis in the lower cervical area. (Tr. 174). The X-ray also

revealed restricted motion in the lower cervical spine and scoliosis in the mid and upper thoracic spine with

spondylosis. (Tr. 174).  Also present was a tilt in the lumbar spine with arthritic changes occurring on the

anterior of the mid lumber vertebrae and the right side of L3. (Tr. 174). As a provisional diagnosis,

Claimant's chiropractor diagnosed Claimant with cervical sprain/strain complex resulting in spondylosis,

which was causing cervicalgia and cephalgia, along with thoracic sprain/strain complex causing

thoracicalgia. (Tr. 174).  Claimant was also diagnosed with lumbar sprain/strain complex, which was

causing spondylosis, intervertebral disc syndrome and lumbalgia. (Tr. 174). At Claimant's April 14, 2006

appointment, positive cervical orthopedic tests were performed, which revealed that Claimant's reflexes in the lower extremities were intact and equal, her range of motion of the lumbar spine was somewhat restricted and bilateral rotation and bilateral lateral flexion elicited pain and discomfort with some of the different movements. (Tr. 173). Claimant's chiropractic care consisted of adjustments of the lumbar, thoracic and cervical areas. (Tr. 173). Claimant was seen three times a week for a period of four weeks. (Tr. 165-172).

On April 15, 2006, an MRI was performed at Radiology Regional Center. (Tr. 150). Prior to Claimant's April 19, 2006 appointment, she underwent a nerve conduction and a needle EMG on her right upper extremities. (Tr. 163). The results were normal; no neuropathy, plexopathy, or radiculopathy was present. (Tr. 163). At Claimant's April 19, 2006 appointment, Dr. Sudderth noted Claimant was suffering spasms in the lower cervical paraspinal region. (Tr. 154). Dr. Sudderth also noted the L5-S1 facet region was tender with spasms on the right and marked tenderness was present over the greater trochanteric bursae bilaterally. (Tr. 154). Dr. Sudderth concluded surgery was not necessary at that moment, but that Claimant was a good candidate for trigger point injection. (Tr. 155).

Claimant returned to Dr. Sudderth's office on May 10, 2006, claiming pain and suffering in the neck and upper shoulders, as well as pain in her lower back area and headaches. (Tr. 153). Dr. Sudderth again noted the L5-S1 facet region was tender with spasms on the right and marked tenderness was present over the greater trochanteric bursae on the right. (Tr. 153).

Claimant returned to Dr. Sudderth's office five (5) days later, on May 15, 2006, again complaining of pain and stiffness in her neck and upper shoulders and pain in lower back and interscapular region. (Tr. 152). Claimant also complained of intermittent numbness in her right hand. Dr. Sudderth again found Claimant was suffering spasms in the lower cervical paraspinal region and the L5-S1 facet region was

tender with spasms on the right with marked tenderness present over the greater trochanteric bursae bilaterally. (Tr. 152).

Dr. Sudderth saw Claimant on May 31, 2006, where she again complained of pain and stiffness in her neck and upper shoulders and severe pain in lower back and interscapular region, which extended into her posterior, thighs and left calf. (Tr. 151). Claimant also informed Dr. Sudderth that the numbness in her right hand had awoken her from sleep. (Tr. 151). Dr Sudderth again made note of the spasms in the lower cervical paraspinal region and the tenderness of both the L5-S1 region and the greater trochanteric bursae. (Tr. 151). He noticed patchy tenderness in the midthoracic paraspinal region. (Tr. 151). Dr. Sudderth recommended a right upper extremity electrophysiological exam. (Tr. 151). Dr. Sudderth prescribed Claimant 10 MG of Flexeril. (Tr. 151). On June 6, 2007, Claimant had a nerve conduction study performed on her. (Tr. 145).

At Claimant's June 21, 2006 visit with Dr. Sudderth, Dr. Sudderth noted trigger points present in the upper trapezius musculature, along with continued tenderness in Claimant's L5-S1 region, and spasms in the lower cervical paraspinal region. (Tr. 143). Claimant returned on July 19, 2006, and informed Dr. Sudderth she continued to suffer lower back pain and pain and stiffness in her neck with radiation to the right arm. (Tr. 142). Claimant informed Dr. Sudderth she was having trouble rotating her head to the right. (Tr. 142). Dr. Sudderth noted that his diagnosis had not changed since Claimant's last visit. (Tr. 142). At this visit, Claimant informed Dr. Sudderth that she did not wish to proceed with facet block or trigger point injections as a form of treatment. (Tr. 142).

On August 9, 2006, Claimant returned with ongoing pain in her neck and lower back, and informed Dr. Sudderth of numbness in the dorsum of her left foot. (Tr. 141). Dr. Sudderth performed a straight leg test, which was positive at 30 degrees. (Tr. 141). Claimant's tenderness and spasms were still present at

this visit. (Tr. 141). Claimant agreed to proceed with the L4-5 epidural. (Tr. 141). On her August 28, 2006 follow-up visit with Dr. Sudderth, he noted considerable improvement following her injection. (Tr. 140). However, Claimant continued to complain about pain in her lower back, posterior and left thigh, as well as stiffness of her neck and upper shoulders. (Tr. 140).

A month later, on September 27, 2006, despite continuing complaints of pain, Dr. Sudderth declared Claimant stable and placed her at maximum medical improvement. (Tr. 138-139). Claimant had achieved four (4) percent permanency on her cervical myofascial injury and six (6) percent permanency on her cervical radiculopathy. (Tr. 138). However, Dr. Sudderth did note that Claimant would likely require medical care in the future and may have a significant disability. (Tr. 138). She returned to FHC on October 25, 2006 and Dr. Edward German, M.D. observed that Claimant had leg numbness and pain and that Claimant's lumbar spine exhibited abnormalities and tenderness with palpation. (Tr. 106).

Claimant visited the Florida Neurological Group, P.L. ("FNG") on May 29, 2007, where she was treated by William J. Carracino, M.D. (Tr. 194). At the initial appointment, Dr. Carracino believed Claimant was suffering from Cervical Spondylosis without Myelopathy and Lumbar Spondylosis without Myelopathy. (Tr. 196). Dr. Carracino stated that the right base of the thumb swelling was not from the accident, and could have resulted from arthritis or tendinitis. (Tr. 196). Claimant's neurological exam was normal, but the doctor noted that parethesias of the left hand was evident in the Claimant. (Tr. 196). Dr. Carracino ordered an EMG and a NCV of the left upper extremity. (Tr. 196).

Claimant and Dr. Carracino met again on June 29, 2007 to review the results of the ordered tests. (Tr. 185). Dr. Carracino stated Claimant had multiple problems, especially the paresthesias and discomfort in her hands. (Tr. 185). The doctor also stated that most of the problems in Claimant's back was pre-existing and spondylitic but had worsened as a result of her April 5, 2006 car accident. (Tr. 188).

-12-

On July 23, 2007, Claimant again visited FHC for cramping in her hand. (Tr. 104). Dr. Melissa Zale, M.D. noted Claimant exhibited tenderness and deformity at the base of her right thumb. (Tr. 105). Dr. Zale prescribed 10 MG of Flexeril for cramping. (Tr. 105). Claimant returned to FHC on August 20, 2007 for a follow-up visit. (Tr. 102). Dr. Zale reviewed the results of Claimant's bilateral hand X-ray and ESR RF. (Tr. 103). On October 16, 2007, Dr. Zale assessed that Claimant had both cervical spondylosis and lumbar spondylosis. (Tr. 98). Dr. Zale prescribed 125 MG of Augmentin. (Tr. 98).

Claimant began seeing Dr. Reggie M. Augusthy, D.O., of Orthopedic Specialists of SW Florida, P.A. ("OSSWF") on September 12, 2007 at the recommendation of both Vocational Rehab and Dr. Zale. (Tr. 228). Dr. Augusthy noted that Claimant had had no specific treatments for her pain issues other that chiropractic treatment, one lumbar injection, a trigger point injection and that she had been taking some prescribed medications. (Tr. 228). The doctor also noted Claimant had not seen a physical therapist. (Tr. 228). Upon physically examining Claimant, Dr. Augusthy determined that internal and external rotation of the left hip elicited pain in the left groin, as did FABER testing. (Tr. 228). However, he also noted Claimant had no significant tenderness to palpation in the lumbar paraspinals or the cervical paraspinals. (Tr. 228). Dr. Augusthy reviewed her MRI results from April 15, 2006, and also conducted cervical and lumbar X-rays in the office, which revealed multilevel degenerative disc disease (most severe at the L3-L4 level) and mild narrowing of the left hip joint compared to the right. (Tr. 228-229). At the end of the visit, Dr. Augusthy recommended updated MRIs to the Claimant. (Tr. 229).

On October 19, 2007, Dr. Vidya P. Kini, M.D., also of OSSWF, performed a nerve conduction study of the Claimant's bilateral upper and lower extremities.(Tr. 224-227). On November 29, 2007, Claimant returned to see Dr. Augusthy, who, after determining Claimant was tender in the bilateral wrist radial side, performed bilateral hand and wrist X-rays. (Tr. 222). Dr. Augusthy determined the X-rays were

unremarkable and no obvious fractures or dislocations were present. (Tr. 222). When assessing the results of the nerve conduction study performed by Dr. Kini, Dr. Augusthy found that the nerve conduction studies of the right upper extremity and bilateral lower extremities were normal and that the EMG was consistent with the right C6 and the bilateral L5 radiculopathy, which was subacute in nature. (Tr. 222). Dr. Augusthy recommended spinal injections for both the cervical and lumbar areas of the spine to deal with the nerve root damage, as well as surgical intervention. (Tr. 222).

On December 3, 2007, Claimant returned to FHC to review her MRI results. (Tr. 92). She informed Dr. Zale that sitting for two hours caused her pain and numbness. (Tr. 92). Dr. Zale again assessed that Claimant was suffering from cervical and lumbar spondylosis, as well as polyneuropthy. (Tr. 93).

Claimant again returned to FHC on January 14, 2008, and Dr. Zale noted that pain in the Claimant's neck was elicited by motion, but otherwise, her range of motion remained intact. (Tr. 91). Dr. Zale again assessed Claimant was suffering from cervical spondylosis and polyneuropathy. (Tr. 91). Dr. Zale saw Claimant again on February 29, 2008, where Claimant complained of numbness and tingling in her legs, which worsened when she sat for prolonged periods of time. (Tr. 87). Dr. Zale noted that pain was elicited  during a cervical exam. (Tr. 88). Dr. Zale increased Claimant's Gabapentin to 600 MG. (Tr. 89). Dr. Zale ordered an X-ray of the Claimant's back due to the bony prominence and laxity in the lumbar spine and an MRI due to radicular symptoms. (Tr. 89). Dr. Zale concluded Claimant was suffering from cervical and lumbar spondylosis, polyneuropthy and cramp of limb. (Tr. 89).

Claimant saw Dr. A. Hyatt, P.T., of OSSWF, on April 10, 2008, and it was noted that Claimant had been seen 13 times. (Tr. 220). However, on this date, Claimant was discharged and instructed to continue with a Home Exercise Plan because she reported no overall relief in pain. (Tr. 220). Claimant returned to Dr. Augusthy's office on April 22, 2008, and he noted she remained tender in the bilateral wrists on the

radial sides. (Tr. 219). Dr. Augusthy again recommended both spinal injections and surgical intervention as forms of treatment, because physical therapy had not alleviated Claimant's pain. (Tr. 219). The doctor then ordered updated imagining. (Tr. 219). Claimant had a Cervical Spine MRI and a Lumber Spine MRI performed on May 12, 2008. (Tr. 217). The MRI of the cervical spine revealed moderate disc space narrowing between C5-C6 with endplate spurring, minimal reactive endplate changes, and spondylitic changes of the middle lower cervical spine with up to mild foraminal narrowing on the right at C4-C5 and C6-C7. (Tr. 216). The MRI of the lumbar spine revealed disc bulging and facet arthopathy at L3-4 through L5-S1 levels, with associated foraminal narrowing on the right at L3-4, bilaterally at L4-5 and on the left at L5-S1. (Tr. 215). At Claimant's May 15, 2008 appointment with Dr. Augusthy, after reviewing her MRI results, Dr. Augusthy recommended epidural steroid injections for both the cervical and lumbar spines to bathe Claimant's disc disease with potent anti-inflammatory medication. (Tr. 214). Dr. Augusthy also suggested having a diagnostic discography of the lumbar spine to determine which spinal disc was generating the pain. (Tr. 214).

Claimant saw Dr. Richards of OSSWF on May 19, 2008 for evaluation of numbness and pain in both of her thumbs. (Tr. 210). Dr. Richards performed three-view X-rays of each hand, which demonstrated marked arthrosis on the right thumb CMC joint and moderate arthrosis on the left thumb CMC joint. (Tr. 210). Dr. Richards assessed Claimant as having bilateral thumb CMC joint osteoarthritis, with the right greater than the left, and chronic cervical and lumbar back pain. (Tr. 210). Dr. Richards recommended thermoplastic splinting and injection, which Claimant agreed to. (Tr. 211). Dr. Richards injected Claimant's right thumb CMC joint with a dexamethasone and lidocaine combination on May 22, 2008. (Tr. 209). Dr. Richards noted that Claimant tolerated this procedure well. (Tr. 209). Claimant returned to see Dr. Richards on June 19, 2008,  and Dr. Richards recommended she continue with her

splint, and noted that the sprain from the accident had been resolved. (Tr. 207). Dr. Richards also noted Claimant admitted to not wearing the splint at all times. (Tr. 207). He did note however, that Claimant may need to have surgery should her arthritis pain reach a level to warrant the need for it. (Tr. 207).

### 2. State Agency Evaluations by Non-Examining Physicians

A Physical Residual Functional Capacity assessment was performed on December 28, 2006. (Tr. 177). Ruth Fuentes, the DDS examiner, determined Claimant was able to lift and/or carry fifty (50) pounds occasionally and was able to lift and/or carry twenty-five (25) pounds frequently. (Tr. 178).  Additionally, the examiner determined Claimant was able to stand and/or walk for about six (6) hours of an eight (8) hour workday and was able to sit for about six (6) hours of an eight (8) hour workday. (Tr. 178).  The DDS examiner cited Dr. Gulde's report from Lee Memorial Hospital following her accident on April 5, 2006 and her follow up with Dr. German of FHC on October 25, 2006 in making her determination about Claimant's residual functional capacity. (Tr. 178-179).

Another Physical Residual Functional Capacity assessment was performed on June 21, 2007. (Tr. 199). Dr. Ronald Kline, the DDS examiner determined Claimant was able to lift and/or carry twenty (20) pounds occasionally and was able to lift and/or carry ten (10) pounds frequently. (Tr. 200).  Additionally, the examiner determined Claimant was able to stand and/or walk for about six (6) hours of an eight (8) hour workday and was able to sit for about six (6) hours of an eight (8) hour workday. (Tr. 200). Kline stated that Claimant's allegations may be credible, but she appeared to be capable of activities within the parameters of the RFC. (Tr. 204).

### E. Medical Evidence Provided to the Appeals Council

Claimant returned to see Dr. Zale on June 30, 2008, and Dr. Zale noted that Claimant's hand motion was abnormal, that pain was elicited by motion of the hands, and that Claimant had weakness of

the hands. (Tr. 236). Dr. Zale also noted pain was elicited by motion of the knee behind the knee. (Tr. 236).

Claimant met with Noble Harrison, Ph.D., Licensed Psychologist, on August 25, 2008. (Tr. 231). After meeting with Claimant and performing a Personality Assessment Inventory, Dr. Harrison concluded that Claimant was in severe emotional distress and was living a severely disruptive life based on a variety of physical problems. (Tr. 232). Dr. Harrison noted that Claimant had a profile compatible with an experience of a disturbing traumatic event in the past which continues to distress her. (Tr. 232). He noted Claimant had a discomforting level of tension and anxiety, which appeared to be in both the affective and physiological areas. (Tr. 232). Claimant displayed physical signs of tension, including sweaty palms, trembling hands, complaints of an irregular heartbeat and shortness of breath. (Tr. 232). Dr. Harrison noted that while she did not report high levels of cognitive symptoms of anxiety, she may be inwardly more troubled by self doubt and have misgivings about her adequacy than what is apparent on the surface. (Tr. 232). Dr. Harrison also noted Claimant refused opioid medications for pain control because she feared addiction and wants to use the least intrusive, yet most effective, treatment possible. (Tr. 232). Dr. Harrison ultimately diagnosed Claimant with Pain Disorder Associated with Both Physiological and General Medical Factors, Depressive Disorder NOS [Significant Anxiety Component], Vocational/Occupational Problems and a GAF score of 40. (Tr. 232).

Claimant returned to FHC to see Ida J. Gagliardi, M.D. on October 2, 2008, because she was experiencing muscle spasms. Dr. Gagliardi noted her cervical and lumbar spines exhibited abnormalities. (Tr. 238). Dr. Gagliardi injected Claimant with 60 MG of ketorolac tromethamine and ordered her to go to the emergency room if her muscle spasms worsened. (Tr. 239). Claimant returned to FHC to see Alice Wofsy, M.D. on January 29, 2009 for an adjustment in her pain medication. (Tr. 243). Dr. Wofsy prescribed Claimant 5 MG of Valium to help her sleep and increased her nightly dose of Gabapentin to 600

MG. (Tr. 244). Dr. Wofsy noted that Claimant was wearing splints on both wrists and that motion of the right thumb elicited pain. (Tr. 243). However, at a follow-up visit on February 26, 2009, Dr. Wofsy noted that Claimant exhibited a full range of motion and that there was no atrophy present. (Tr. 245).

Claimant saw Dr. Justin A. Yax, D.O. of FHC on March 26, 2009 for a follow-up visit for pain in her right hand. (Tr. 247). Dr. Yax instructed Claimant to consider a subsidized referral to a rheumatologist to determine if she had fibromyalsa or another form of etiology. (Tr. 247-248).

F.    **Testimony**

On April 7, 2009, at the administrative hearing, Claimant testified on her own behalf. (Tr. 257). Claimant testified that she has a high school education, having completed the twelfth grade, and that following graduation she worked in convenience stores as a cashier. (Tr. 259). Claimant testified that she worked her way up to the Assistant Manager position at Circle K until the gas station went into bankruptcy. (Tr. 259). She was then an assistant manager at her next position. (Tr. 259). Claimant testified she was working as a Cashier at a Shell gas station at the time when she was involved in her automobile accident. (Tr. 259). She testified her job at Shell required eight (8) hours of standing and physical labor, as she had to restock the store. (Tr. 259).

Claimant testified that she has lower back pain and is unable to sit or stand for long periods of time, as well as imbalance problems which cause her to fall frequently. (Tr. 260). She also testified that the worst pain she experienced comes from her nerves. (Tr. 261). Claimant stated Gabapentin usually takes the pain away from her wrists and hands but typically wears off before the next dosage is to be taken. (Tr. 261). Claimant stated she also takes Valium to prevent the pain nightmares and anxiety she had previously been experiencing. (Tr. 261).

Claimant also testified that she is sometimes unable to write with a pencil due to extreme cramping

in her thumb. (Tr. 260). Claimant stated she is now unable to lift heavy things and frequently drops items from her hands when she has muscle spasms in her hands. (Tr. 260). Claimant stated she has trouble with finger manipulation and has trouble removing cards and change at the grocery store. (Tr. 261). Claimant testified that she can lift ten (10) to twenty (20) pounds at the most. (Tr. 263).

Claimant stated that her stiffness is worse in the morning and she has to do the dishes with the water at its hottest setting to loosen up her stiffness. (Tr. 263). She testified that she can still do some normal household chores, including vacuuming, general cleaning and cooking every other day. (Tr. 263-264). However, Claimant stated she has neighbors who help her care for her yard and sell her plants. (Tr. 264). Claimant also complained that she can no longer engage in her two favorite hobbies: gardening and playing the guitar. (Tr. 266). Claimant then stated she is able to visit with her church ladies every week. (Tr. 266).

Claimant also testified that minimal exercise, including walking and riding a bicycle around the block, cause her significant amounts of pain. (Tr. 261-262). Claimant stated she can drive for about forty-five (45) minutes before her arms get fatigued. (Tr. 265). She also stated she can only sit for thirty (30) to forty-five (45) minutes comfortably. (Tr. 265). She stated she takes a daily nap somewhere around 3:00 to 5:00 in order to help her get through the day. (Tr. 264-265). Claimant testified that she began exhibiting symptoms of depression a few months after her husband passed away, but was placed on anti-depressants which curbed her symptoms. (Tr. 265-266).

Claimant testified she would be unable to do any type of work that required her to work eight (8) hours a day for five (5) days a week, to sit all day or to do any form of writing. (Tr. 266-267). The ALJ stated he would render his decision after receiving a fax that contained additional evidence of the Claimant's condition. (Tr. 257, 267).

III.     **Specific Issues and Conclusions of Law**

Claimant raises four issues on appeal. As stated by Claimant, they are: (1) the ALJ failed to consider and weigh Dr. Harrison's psychological assessment of Claimant in his decision as required by agency regulations and *Sharfarz*; (2) the ALJ failed to follow the mental impairment evaluation procedures as required by 20 C.F.R. §§ 404.1520(a), 416.920(a); (3) the ALJ improperly considered Dr. Richards' opinion with respect to Claimant's hand/thumb pain problems and improperly ignored other relevant evidence in the record, which led the ALJ to an improper conclusion that Claimant could perform the requirements of the hotel clerk job; and (4) the ALJ's decision should be reversed and the case remanded for an award of the requested benefits.

A.     **Whether The ALJ Erred In Failing to Consider Dr. Harrison's Report**

Claimant met with Dr. Harrison, a Licensed Psychologist on August 25, 2008, after having been referred by her Vocational Counselor, Brad Scott of the North Fort Myers Office of the Division of Vocational Rehabilitation. Dr. Harrison examined Claimant and diagnosed her with Pain Disorder Associated with Both Psychological and General Medical Factors, Depressive Disorder NOS [Significant Anxiety Component], Vocational/Occupational Problems and a GAF score of 40. Claimant argues that the ALJ failed to consider the opinion of Dr. Harrison, or in the alternative, if he did consider Dr. Harrison's report, he failed to articulate the weight given to Dr. Harrison's opinion.

An ALJ is required to consider all of the evidence in the case record when he makes his determination.  20 C.F.R. §404.1520(a).  The record as presented to this Court does not include Dr. Harrison's report in the section of the record that was submitted to the ALJ.  The Court recognizes that a letter from a non-attorney representative dated July 13, 2009, was sent to the Appeals Council indicating that additional evidence (which included Dr. Harrison's report) was submitted to the ALJ, and the ALJ

did not evaluate this evidence in his decision. (Tr. 8). However, the record before the ALJ does not

include the report of Dr. Harrison, and there is no indication in the record that Dr. Harrison's report was

received by the ALJ. The Appeals Council entered an Order which indicated that it had received

additional evidence which included Dr. Harrison's report dated August 25, 2008. (Tr. 6). The Court finds

that the ALJ did not err in not considering Dr. Harrison's report as it was not part of the record before the

ALJ.

The Appeals Council did receive Dr. Harrison's report and issued its decision finding "no reason

under our rules to review the Administrative Law Judge's decision." (Tr. 3, 6). In her Memorandum of

Law (Doc. 12), the Claimant did not raise any issues challenging the decision of the Appeals Council.

New evidence can be submitted to the Appeals Council after the ALJ has rendered his decision, however

a claimant must challenge the decision of the Appeals Council in order for this Court to review the newly

submitted evidence. "[W]hen a claimant challenges the administrative law judge's decision to deny

benefits, but not the decision of the Appeals Council to deny review of the administrative law judge, we

need not consider evidence submitted to the Appeals Council." *Ingram v. Comm'r. of Soc. Sec.*, 496 F.3d

1253, 1266 (11th Cir. 2007) (interpreting *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998)). Therefore, this

Court need not consider Dr. Harrison's report when reviewing the decision of the ALJ because the

Claimant failed to challenge the decision of the Appeals Counsel. The Court finds that the ALJ did not

err in not considering or in failing to articulate the weight to be given to Dr. Harrison's report.


**B.      Whether The ALJ Erred By Failing to Consider the Reports of Claimant's Treating Physicians' In Combination With All Of The Other Relevant Evidence**

As stated above, an ALJ is required to consider all of the evidence in the case record when he

makes his determination.  20 C.F.R. §404.1520(a), *Brunson v. Astrue*, ___ F. Supp. 2d ____, 2011 WL 839366 at *12 (M.D. Fla. March 7, 2011).  An ALJ must consider the medical opinions that were submitted in the record as well as other relevant evidence.  20 C.F.R. §404.1527(b).  Medical opinions are statements from physicians and may include a claimants's symptoms, diagnosis and prognosis. 20 C.F.R. §404.1527(a)(2).  The ALJ is required to "state with particularity the weight he gave the different medical opinions and the reasons therefore." *Sharfarz v. Bowen*, 825 F.2d 278, 279-80 (11th Cir. 1987, *See also, Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011)).  Without such a statement by the ALJ, a court cannot determine if the merits of claim are rational and supported by substantial evidence. *Winschel*, 631 F.3d at 1179.  An ALJ may disregard an opinion of a treating physician, however, he must articulate clear reasons for disregarding an opinion.  *Winschel*, 631 F.3d at 1179.  In the instant case, the ALJ failed to consider the medical reports of the Claimant's treating physicians at the Family Health Centers, specifically the reports of  Melissa Zale, M.D.

In his decision, the ALJ considered evidence from a number of specialists, including but not limited to Dr. Sudderth of Neuroscience and Spine Associates, Dr. Carracino of Florida Neurology Group, P.L. and Drs. Richards and Augusthy, both of Orthopedic Specialists of SW Florida.  However, the ALJ failed to mention or consider the reports from Claimant's treating physicians at Family Health Centers. He simply stated, "the undersigned notes that he has considered and given considerable weight to the opinions of the treating and examining physicians as they are substantiated by the objective medical evidence of record." (Tr. 19).   From that statement, the Court cannot determine if the ALJ considered the reports from the Family Health Center, and he did not state with particularity the weight he gave these medical opinions.

Specifically, Dr. Zale's reports are inconsistent with other medical reports in the record.   Dr. Zale

diagnosed the Claimant with polyneuropathy in her reports of December 3, 2007, January 14, 2008, and February 29, 2008.   Whereas Dr. Carracino's May 29, 2007 report states Claimant had a normal neurological exam, Dr. Zales' reports were more recent than Dr. Carracino's report.   Even though the Claimant was seeing Dr. Zale for reasons unrelated to her pain complaints, Dr. Zale  deemed it necessary to assess the Claimant with polyneuropthy. The ALJ made no mention of Dr. Zale's reports, nor did he note that Dr. Zale had ordered an MRI because of Claimant's radicular symptoms and an X-ray of Claimant's back.

The ALJ failed to adequately explain whether polyneuropathy affects the Claimant's ability to work.   The ALJ failed to discuss or reference the Claimant's polyneuropathy in his opinion.   While it is true that the ALJ does not have to refer to every piece of evidence submitted by a claimant, an ALJ must explain "why 'significant probative evidence has been rejected.'" *Brunson*, 2011 WL 8399366 at *12 (citing *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984)).   By the ALJ failing to discuss Dr. Zale's report, the Court determines that the medical evidence was not reviewed as a whole.   The Court finds that the ALJ erred in not discussing the weight to be given to Dr. Zale's reports.


**C.    Whether The ALJ Erred By Failing to Complete A Psychiatric Review Technique Form**

Claimant contends the ALJ failed to follow the mental impairments evaluation procedures as required by 20 C.F.R. §404.1520a, 416.920a.   Claimant argues that the ALJ should have ordered that a Psychiatric Review Technique Form be completed, and then considered the form in his decision. Claimant argues she has sufficiently presented a colorable claim of mental impairment, and therefore, under 20 C.F.R. § 404.1520a(a), the ALJ must use the findings when making his disability determination. The

Commissioner asserts that the ALJ is not required to investigate claims not presented to him in the application for benefits or at the administrative hearing. "[I]t has been persuasively held that an 'administrative law judge is under no obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability.'" *Street v. Barnhart*, 133 F. App'x. 621, 627 (11th Cir. 2005) (quoting *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996)) (internal quotations omitted).

The Court agrees with the Commissioner's argument. At her hearing, Claimant's attorney listed a number of physical impairments, but failed to mention any mental impairments. (Tr. 258). Further, Claimant stated her outbursts of tears were quickly halted with the use of anti-depressants. (Tr. 266). Claimant's record before the ALJ is silent as to mental impairments.[1]  The ALJ was under no obligation to inquire as to whether Claimant suffered from mental impairments,  and was correct in his decision not to order that a Psychiatric Review Technique Form  be completed. Accordingly, the ALJ did not err in failing to order the completion of a Psychiatric Review Technique form.

### D.    Whether The ALJ Properly Considered Dr. Richard's Report In Conjunction With All Other Relevant Evidence

Claimant asserts that the ALJ did not consider all relevant evidence when he determined the residual functional capacity of the Claimant. Claimant argues the ALJ failed to consider Dr. Richard's notes regarding his treatment of the Claimant's hand/thumb pain which showed that it was continuing and deteriorating.[2]  The Claimant also argues that she testified at the hearing that the pain in her thumb would

---

[1]  The Court will not consider Dr. Harrison's report in its analysis  because it was submitted to the Appeals Council only.

[2]  The Claimant also contend that the ALJ ignored the reports of Dr. Wofsy and Justin A. Yax, M.D.  The reports from these doctors were submitted to the Appeals Council only and therefore the Court will not consider them.

only allow her to write for a small amount of time , that the pain in her wrists would not allow her to carry

heavy objects, and she has difficulty manipulating objects with her fingers.

"If your impairment(s) does not meet or equal a listed impairment, we will assess and make a

finding about your residual functional capacity based on all the relevant medical and other evidence in

your case record." 20 C.F.R. § 404.1520(e). There is "no rigid requirement that the ALJ specifically refer

to every piece of evidence in his decision," as long as the court can conclude all the evidence was

considered.  *Dyer v. Barnhart* 395 F.3d 1206, 1211 (11th Cir. 2005).  The ALJ did refer to Dr. Richards

assessment, noting that Claimant was doing well after the injection and that the sprain from the accident

had been resolved. (Tr. 19). While Dr. Richards did note Claimant had an obvious physical deformity, he

concluded she had done "quite well" with the injection she had been given. (Tr. 207). Further, he

concluded the pain experienced by Claimant was not severe enough at the time to warrant surgery. (Tr.

207). The ALJ's inclusion of this evidence in his finding supports the claim that the ALJ did in fact

consider Dr. Richard's notes in conjunction with all other relevant evidence in the record.

The Eleventh Circuit has held that the ALJ can make a credibility determination about the

Claimant's alleged pain. *See Gibson v. Heckler*, 779 F.2d 619, 624 (11th Cir. 1986). Furthermore, when

the record and  Claimant's complaints of pain are inconsistent or contradictory, the ALJ may reject

Claimant's testimony. *See Pritchett v. Comm'r. Soc. Sec. Admin.*, 315 F. App'x. 806, 812 (11th Cir. 2009).

The ALJ found that the Claimant's medically determinable impairments "could reasonably be expected

to cause the alleged symptoms; however, the claimant' statements concerning the intensity, persistence

and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above

residual functional capacity assessment." (Tr. 19).  The ALJ referred to medical reports that the Plaintiff

was doing well after the injection in her right hand.  (Tr. 19). The ALJ did consider both the Claimant's

testimony of her subjective complaints of pain and the medical reports submitted to make his determination.  The ALJ properly considered the RFC completed by the non-examining sources in conjunction with the medical evidence, including the reports of Dr. Richards to determine that the Claimant could return to her past relevant employment. The ALJ properly considered the opinion of Dr. Richards and considered all relevant evidence to determine that the Claimant could perform the Requirements of her past relevant work of a hotel clerk.

     **E.**     **Whether The ALJ's Decision Should Be Reversed And Remanded For An Award Of Benefits**

Claimant contends the ALJ's decision should be reversed and the case remanded for an award of the requested benefits. The Court determines that a remand is appropriate on one issue only, for consideration of the reports of the treating physicians at Family Health Centers. Therefore, the Court does not find that an award of benefits to be appropriate.

**IV.**    **Conclusions**

For the foregoing reasons, the ALJ erred in not considering the treating physicians' report from the Family Health Centers, and therefore, his decision is not consistent with the requirements of law and not supported by substantial evidence on this issue only. Therefore, it is respectfully recommended that the decision of the Commissioner as to this issue be **REVERSED and REMANDED** pursuant to sentence four of 42 U.S.C. §405(g).

As to all of the other issues raised, the ALJ's decision is consistent with the requirements of law and supported by substantial evidence.  Therefore, it is respectfully recommended that the decision of the Commissioner as to these issues be **AFFIRMED** pursuant to sentence four of 42 U.S.C. §405(g).

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Chambers in Ft. Myers, Florida this  24th   day of  August , 2011.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record